**PACIFICA FOUNDATION, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**No. 75–1391.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 30, 1976.

Decided March 16, 1977.

Harry M. Plotkin, Washington, D. C., with whom Thomas Schattenfield, David F. Tillotson and Mary Candace Fowler, Washington, D. C., were on the brief for petitioner.

Joseph A. Marino, Counsel, F. C. C., Washington, D. C., with whom Ashton R. Hardy, Gen. Counsel, Raymond L. Strassburger and Richard J. Bodorff, Counsel, F. C. C. and Robert J. Wiggers, Atty., Dept. of Justice, Washington, D. C., were on the brief for respondents. Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., Washington, D. C., also entered an appearance for respondents.

Henry Geller and Charles M. Firestone, filed a brief on behalf of the Committee for Open Media, San Francisco Chapter, as amicus curiae.

Before BAZELON, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.

Opinion filed by TAMM, Circuit Judge.

Concurring opinion filed by BAZELON, Chief Judge.

Dissenting opinion filed by LEVENTHAL, Circuit Judge.

TAMM, Circuit Judge:

This appeal by Pacifica Foundation (Pacifica) challenges a Federal Communications Commission (FCC or Commission) ruling which purports to ban prospectively the broadcast, whenever children are in the audience, of language which depicts sexual or excretory activities and organs, specifically seven patently offensive words.

Without deciding the perplexing question of whether the FCC, because of the unique characteristics of radio and television, may prohibit non-obscene speech or speech that would otherwise be constitutionally protected, we find that the challenged ruling is overbroad and carries the FCC beyond protection of the public interest into the for-

bidden realm of censorship. For the reasons which follow, we reverse the Commission's order.

## I. FACTUAL BACKGROUND

On the afternoon of October 30, 1973, Station WBAI, New York, New York (which is licensed to Pacifica), was conducting a general discussion of contemporary society's attitude toward language as part of its regular programming. The WBAI host played a segment from the album, "George Carlin, Occupation: Foole," Little David Records. Immediately prior to the broadcast of the Carlin monologue, listeners were advised that it included sensitive language which might be regarded as offensive to some. Those who might be offended were advised to change the station and return to WBAI in fifteen minutes. The monologue consisted of a comedy routine that was almost entirely devoted to the use of seven four-letter words depicting sexual or excretory organs and activities.

On December 3, 1973, the Commission received a complaint from a man in New York stating that, while driving in his car with his young son, he had heard the WBAI broadcast of the Carlin monologue. This was the only complaint lodged with either the FCC or WBAI concerning the Carlin broadcast.

The Commission determined that clarification of its definition of the term "indecent" was in order. As a result, in *Pacifica Foundation,* 56 F.C.C.2d 94 (1975) (hereinafter *Order*), the Commission defined as indecent, language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs, at times of the day when there is a reasonable risk that children may be in the audience. The Commission found that the seven four-letter words contained in the Carlin monologue depicted sexual or excretory organs and activities in patently offensive manner, judged by contemporary community standards for the broadcast medium, and accordingly, were indecent. The Commission prohibited them from being broadcast under the authority granted it by 18 U.S.C. § 1464 (1970).[1] As a further rationale for its decision, the Commission cited its statutory obligation to promote the larger and more effective use of radio in the public interest.[2]

The underlying rationale of the *Order* can be traced to the Commission's view of broadcasting vis-à-vis other modes of communication and expression. According to the Commission, the broadcasting medium carries with it certain unique characteristics which distinguish it from other modes of communication and expression. In the Commission's view the most important characteristic of the broadcast medium is its intrusive nature. Unlike other modes of expression, the television or radio broadcast comes directly into the home without any significant affirmative activity on the part of the listener. ·See *Eastern Educational Radio* (WUHY–FM), 24 F.C.C.2d 408 (1970); *Illinois Citizens Committee for Broadcasting v. FCC,* 169 U.S.App.D.C. 166, 515 F.2d 397 (1975). In the *Order* the FCC concluded this intrusive nature was a critical factor due to four important considerations: (1) children have access to radios and in some cases are unsupervised by parents; (2) radio receivers are in the home, a place where people's privacy interest is entitled to extra deference; (3) unconsenting adults may tune in a station without any warning that offensive language is being or will be broadcast; and (4) there is a scarcity of spectrum space, the use of which the government must therefore license in the public interest. *Order* at 97.

---

1. 18 U.S.C. § 1464 (1970) provides:

   Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined not more than $10,000 or imprisoned not more than two years, or both.

2. 47 U.S.C. § 303 (1970) provides:

   Except as otherwise provided in this Chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall: . . .

   (g) Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest . . . ..

In light of these considerations the Commission felt that questions concerning the broadcast of patently offensive language should be dealt with in a public nuisance context. As a result the Commission determined that the principle of channeling[3] should be borrowed from nuisance law and applied to the broadcasting medium. Rather than prohibit the broadcast of indecent language altogether, the Commission sought to channel it to times of the day when it would offend the fewest number of listeners.

In hopes of avoiding the charge that the *Order* was overbroad, the Commission declared that the channeling was specifically intended to protect children from exposure to language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs, at times of the day when there is a reasonable risk that children may be in the audience. *Order* at 98.

Finally, the Commission did note that when the number of children in the audience is reduced to a minimum, a different standard might conceivably be used. In such an analysis the definition of indecent would remain the same, however, the Commission would also consider whether the material had serious literary, artistic, political or scientific value. *Order* at 100.

In concurring statements, Commissioners Reid and Quello felt the *Order* did not go far enough. Commissioner Reid believed indecent language was inappropriate for broadcast at any time. Commissioner Quello was in agreement, commenting that "garbage is garbage" and it should all be prohibited from the airwaves. *Id.* at 102, 103.

Appellant Pacifica argues that section 1464 is unconstitutionally vague unless the term indecent is subsumed by the term obscene as defined in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Pacifica contends that the Supreme Court, in *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) and *United States v. 12 200 Ft. Reels of Super 8mm Film,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973), has made it clear that the term indecent, as used in federal criminal statutes, must be construed as referring to material involving the specific types of explicit conduct defined in *Miller v. California,*[4] *supra,* in order for the constitutionality of the statute employing the term to be sustained. Pacifica also cites numerous other federal and state court decisions which have invariably held that the term indecent, as used in criminal statutes, refers to material which appeals to prurient interest as distinguished from material which is merely coarse, rude, vulgar, profane or opprobrious.[5]

Pacifica argues that the Carlin monologue is not obscene because it does not appeal to any prurient interest and because it has literary and political value. Therefore, Pacifica argues it is entitled to constitutional protection in light of *Miller* and *Hamling, supra.* Pacifica concludes that such constitutional protection means that these words may not be prohibited by section 1464. In addition, Pacifica contends that the non-obscene language used in the Carlin monologue does not come within the fighting words prohibition set forth in *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

---

**3.** The law of nuisance does not say, for example, that no one shall maintain a cement plant; it simply says that no one shall maintain a cement plant in an inappropriate place, such as a residential neighborhood.

**4.** The *Miller* standard is
   a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest;

   b) whether the work depicts or describes in a patently offensive way, sexual conduct specifically defined by the applicable state law; and
   c) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value. 413 U.S. at 24, 93 S.Ct. at 2615.

**5.** Pacifica's Brief at 24, n. 23.

Finally, Pacifica contends that the FCC standard of indecency, as expressed in the *Order,* is overbroad as it does not assure that programs of serious literary, artistic, political or scientific value will be allowed to air.[6] The amicus brief in this appeal argues that the *Order* is too far-reaching and will have an especially harsh effect on the broadcast of literature depicting minority cultures. In addition, the amicus brief quotes studies,[7] which show that large numbers of children are in the broadcast audience until 1:30 a. m., as further evidence that the *Order* is overbroad.

One week prior to oral argument in this case the FCC released a memorandum and order seeking to clarify its earlier *Order.* The order of clarification[8] was in response to a petition filed by the Radio Television News Directors Association. In the clarification order, the Commission declared that it never intended to place an absolute prohibition on the broadcast of indecent language but only sought to channel it to times of the day when children would least likely be exposed to it.[9] The clarifying order, in attempting to narrow the scope of the original *Order,* ruled that indecent language could be broadcast in a news or public affairs program or otherwise if it was aired at a time when the number of children in the audience was reduced to a minimum, if sufficient warning were given to unconsenting adults, and if the language in context had serious literary, artistic, political or scientific value.[10] The Commission determined that it would be inequitable to hold a licensee responsible for indecent language broadcast during live coverage of a newsmaking event.[11] The Commission thought it better to trust the licensee to exercise judgment, responsibility and sensitivity to the needs, interest, and tastes of the community.[12]

## II. RESOLUTION

■ Despite the Commission's professed intentions, the direct effect of its *Order* is to inhibit the free and robust exchange of ideas on a wide range of issues and subjects by means of radio and television communications. In promulgating the *Order* the Commission has ignored both the statute which forbids it to censor radio communications[13] and its own previous decisions and orders which leave the question of programming content to the discretion of the licensee.[14]

The Commission claims that its *Order* does not censor indecent language but rather channels it to certain times of the day. In fact the *Order* is censorship, regardless of what the Commission chooses to call it. The intent of the Commission is clear. It is to keep language that describes sexual or excretory organs and activities from the airwaves when there is a reasonable risk that children may be in the audience. The Commission expressly states that this language has "no place on radio" and that when children are in the audience a claim that it has literary, artistic, political or scientific value will not redeem it. *Order* at 98.

As the study cited by the amicus curiae, *supra* note 7, illustrates, large numbers of

6. *See* App. B. at 28, et seq.

7. Amicus's Brief at 17 *quoting* Statement of John A. Schneider, Before the House Subcommittee on Communications, July 15, 1975, p. 9.

8. Pacifica Foundation, 59 F.C.C.2d 892 (1976).

9. *Id.*

10. *Id.*

11. *Id.*

12. *Id.*

13. 47 U.S.C. § 326 (1970) provides:

Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication.

14. *See* Sonderling Broadcasting Corp., 41 F.C. C.2d 777 (1973); Jack Straw Memorial Foundation, 29 F.C.C.2d 334 (1971); Columbia Broadcasting System, Inc., 21 P&F Radio Reg.2d 497 (1971); Oliver R. Grace, 22 F.C.C.2d 667 (1970).

children are in the broadcast audience until 1:30 a. m. The number of children watching television does not fall below one million until 1:00 a. m. As long as such large numbers of children are in the audience the seven words noted in the *Order* may not be broadcast. Whether the broadcast containing such words may have serious artistic, literary, political or scientific value has no bearing on the prohibitive effect of the *Order.* The Commission's action proscribes the uncensored broadcast of many of the great works of literature including Shakespearian plays and contemporary plays which have won critical acclaim, the works of renowned classical and contemporary poets and writers, and passages from the *Bible.*[15]

■ Section 326 of the Communications Act specifically prohibits the FCC from interfering with licensee discretion in programming. *Writers Guild of America, West, Inc. v. FCC,* 423 F.Supp. 1064 (C.D. Cal., 1976). Such interference is exactly what the *Order* calls for. Therefore it is an action which takes the Commission beyond the limits of the powers which Congress has delegated to it. Congress specifically withheld from the Commission any power to censor broadcasts. *Anti-Defamation League of B'Nai B'Rith v. FCC,* 131 U.S. App.D.C. 146, 403 F.2d 169 (1968), *cert. denied,* 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969); 47 U.S.C. § 326 (1970). Any examination of thought or expression in order to prevent publication of objectionable material is censorship. 403 F.2d 169.

In an effort to sustain the validity of its *Order* the Commission labels its prospective ban a channeling mechanism. The label is unimportant, the effect of the *Order* is critical. The effect is that of censorship and that is beyond the mandate of the FCC.

In past decisions the Commission has recognized the ban against censorship and has taken another tack against indecent language. In *Jack Straw Memorial Foundation,* 29 F.C.C.2d 334 (1971), the Commission determined that the decision whether to broadcast obscene or indecent language was a licensee decision. In this case, the licensee, after careful consideration, broadcast the record, "Murder at Kent State", which contained language which the licensee considered obscene and ordinarily would not have permitted to be broadcast. The trustees and managerial employees decided that in their judgment the use of the particular language was necessary under the circumstances. In its ruling the Commission held that

[t]his is a matter of judgment which we conclude the Commission has left to the licensee. In this case, language was not broadcast for shock or sensationalism, but rather for the purpose of presenting a vivid accurate account of a disastrous incident in our recent history. We conclude that on this exercise of judgment, the licensee conformed to standards prescribed by the Commission as well as its own policies regarding suitability.

29 F.C.C.2d at 354. In *Oliver R. Grace,* 22 F.C.C.2d 667 (1970), the Commission, recognizing that section 326 of the Communications Act prohibited it from censoring broadcast matter, held that program choice was the responsibility of the licensee; the licensee was required to ascertain and reasonably serve the needs and interests of his community; and the charge that programs are vulgar or presented without due regard for sensitivity, intelligence, and taste, was not properly cognizable by the Commission, in light of the proscription against censorship. *Id.* at 668.

The importance of independent judgment by local licensees has been affirmed again and again by the FCC and the courts.[16] Perhaps the most important ruling for our purpose is the Commission's clarification memorandum regarding the original *Order.* There the Commission recognized that

15. App. B. at 28–39.

16. *See Writers Guild of America, West, Inc. v. FCC,* 423 F.Supp. 1064 (C.D.Cal., 1976); Report on Broadcast of Violent Indecent and Obscene Material, 51 F.C.C.2d 418 (1975); Network Programming Inquiry, 39 Fed.Reg. 26372 (1974). En Banc Programming Inquiry, 44 F.C.C. 2303 (1960).

in some cases, public events likely to produce offensive speech are covered live, and there is no opportunity for journalistic editing. Under these circumstances we believe that it would be inequitable for us to hold a licensee responsible for indecent language.

*Pacifica Foundation,* 59 F.C.C.2d 892, 893 n. 1 (1976). Thus the Commission indirectly admitted it had gone too far in banning "indecent" language from the airwaves. The Commission decided it would be better to trust the licensee to exercise judgment, responsibility and sensitivity to the community's needs, interests and tastes. *Id.*

Previously the Commission has readily admitted that its authority in the area of profane, obscene, or indecent language is governed by federal statutes as interpreted by the courts. The FCC has recognized that it must perform its duties in this area without infringing upon constitutional guarantees of freedom of speech and of the press, *Columbia Broadcasting System, Inc.,* 21 P & F Radio Reg.2d 497 (1971), and without violating the statutory obligations of section 326 of the Communications Act. It must continue to do so.

We do not find it necessary to determine whether the term "indecent" can be more narrowly defined than the term "obscene". The FCC's position is that "indecent" language may be distinguished from "obscene" language in that it lacks the element of appeal to prurient interest and that when children are in the audience it cannot be redeemed by a claim that it has literary, artistic, political or scientific value. *Order* at 98.

This question has confronted other courts but there have been no definitive resolutions as yet. In *Gagliardo v. United States,* 366 F.2d 720 (9th Cir. 1966), the Ninth Circuit left open the question whether indecent, as used in section 1464, could be defined differently from obscene. Although the question of whether indecent might mean something different from obscene was raised in *Tallman v. United States,* 465 F.2d 282 (7th Cir. 1972), it was

not resolved since the case had only been tried on the theory that the defendant had uttered obscene language. The question was considered only tangentially in *United States v. Smith,* 467 F.2d 1126 (7th Cir. 1972), where the court reversed a conviction under section 1464 on the grounds that the jury had not been instructed as to the meaning of the statutory terms profane and indecent, even though the case had been presented to the jury under an indictment charging the defendant with uttering obscene, indecent and profane language. In reversing the conviction, the court did not suggest in what way, if at all, indecent language might differ from obscene language. It is evident therefore that the term indecent has never been authoritatively construed by the courts in connection with section 1464. Since we feel section 326 of the Communications Act is dispositive of this appeal we do not find it necessary to resolve this difficult question.

Unquestionably the Commission's *Order* also raises First Amendment considerations. The Commission recognized that Congress had prohibited it from engaging in censorship or interfering "with the right of free speech by means of radio communication." [17] In the *Order,* the Commission contends that because of its unique qualities the broadcast medium is not subject to the same constitutional standards that may be applied to other less intrusive forms of expression.

■ There is no doubt that the regulatory authority of the FCC encompasses more than the technical engineering aspects of the broadcast medium. Under its mandate to promote the public interest, the Commission may promulgate rules on a variety of matters, including broadcast programming. However, any such actions by the Commission must be carefully tailored to meet the requirements of the First Amendment, as Congress has explicitly mandated in section 326 of the Communications Act.

17. 47 U.S.C. § 326 (1970).

The requirements of the First Amendment relating to obscenity are found in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). In *Miller*, the Court set forth a subjective standard by which the trier of fact could determine whether material was obscene. The standard developed by the Court involves: a) whether the average person applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and c) whether the work taken as a whole, lacks serious literary, artistic, political or scientific value *Id.* at 24, 93 S.Ct. 2607.

Applying the *Miller* standard to the language used in the Carlin monologue, it is clear that although the language is crude and vulgar by most standards it is not obscene. The FCC agrees. *Order* at 98. As used, the words do not appeal to the prurient interest.[18] They are merely crude statements and are not used to titillate. Furthermore, the words prohibited by the *Order* may often be connected with programs in the public interest, e. g. plays and live news broadcasts. Thus, these words quite possibly could have literary, political or artistic value. Therefore this non-obscene speech is entitled to First Amendment protection.

■ The Commission claims an exception from First Amendment requirements in order to carry out its duty to promote the use of radio communications in the public interest. The basis of this claim is that the broadcast medium is unique. Assuming, arguendo, that the FCC has the power to prohibit non-obscene speech from being broadcast, the statute or order instituting such a ban must not be overbroad or vague. *See Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). As will be illustrated, the *Order*, in its application of Section 1464, suffers from overbreadth and vagueness.

In *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), the Court held that rigorous constitutional standards apply when government attempts to regulate expression. Furthermore, when the government, acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power. *Id.* at 209, 95 S.Ct. 2268. Indeed, when First Amendment freedoms are at stake, the Court has repeatedly emphasized that precision of drafting and clarity of purpose are essential. *Id.* at 217–18, 95 S.Ct. 2268.

The FCC's regulation of speech per its *Order* fails to meet the rigorous standards of the Supreme Court. A look at *Erznoznik* will help illustrate why. There a municipal ordinance made it unlawful for a drive-in theater to exhibit any motion picture in which the human male or female buttocks, human female bare breasts or human bare pubic areas were shown. The city attempted to sustain the ordinance as an effort to protect children. The Court held that minors are entitled to First Amendment protection and only in relatively narrow, well-defined circumstances may the government bar public dissemination of protected materials to them. *Erznoznik*, 422 U.S. at 212–13, 95 S.Ct. 2268. The Court found the ordinance overbroad in that it sweepingly forbid the display of all films containing any uncovered breasts or buttocks, irrespective of context or pervasiveness. *Id.* at 213, 95 S.Ct. 2268. Mr. Justice Powell, writing for the majority, stated that

[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.

*Id.* at 213–14, 95 S.Ct. 2275.

The situation in this appeal is quite similar to that in *Erznoznik*. The *Order* prohibits the broadcast of seven words at times of the day when there is a reasonable risk that

---

**18.** *See* App. A at 10–12.

children will be in the audience. Thus, the *Order* sweepingly forbids any broadcast of the seven words irrespective of context or however innocent or educational they may be. For instance, the *Order* would prohibit the broadcast of Shakespeare's *The Tempest* or *Two Gentlemen of Verona.* Certain passages of the *Bible* are also proscribed from broadcast by the *Order.*[19] Clearly every use of these seven words cannot be deemed offensive even as to minors. In this regard the *Order* is overbroad. It is not saved by the attempted clarification, for that order would only permit the words to be broadcast on live news shows or very late at night.[20]

In addition, the *Order* is vague in that it fails to define children. Need a nineteen year old and a seven year old be protected from the same offensive language? The Supreme Court has held that in assessing the requisite capacity of individual choice the age of the minor is a significant factor.[21] The *Order* does not even consider age as a factor, much less a significant one.

The Commission also attempts to justify its *Order* by claiming that, due to the intrusive nature of broadcasting, a captive audience is present. This argument is persuasive when the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure. However, as the Supreme Court noted in *Lehman v. City of Shaker Heights,* 418 U.S. 298, 302, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974), "[t]he radio can be turned off."

*Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), is also analogous to the present situation. Cohen was convicted of violating California Penal Code Section 415, which prohibits "maliciously and wilfully disturb[ing] the peace or quiet of any neighborhood or person . . .

by . . . offensive conduct . . . ." Cohen had walked in a public corridor of the Los Angeles County Courthouse wearing a jacket inscribed with a four-letter word. California argued that the state may act to protect the unwilling or unsuspecting viewers from unavoidable exposure to such language. *Id.* at 21, 91 S.Ct. 1780. This reasoning is similar to the FCC's expressed desire to protect the unsuspecting dial scanner from crude, offensive programming. In *Cohen,* the Court held that government control of objectionable speech can be tolerated only when substantial privacy interests are being invaded in an essentially intolerable manner. *Id.* 91 S.Ct. 1780. Such an invasion had not occurred in *Cohen,* the Court found, because the offensive expression had occurred in public and because citizens could avoid it easily by averting their eyes. *Id.* Likewise, one can argue an intolerable invasion of privacy would not occur in the broadcast setting. Privacy expectations, even in the home, diminish when listeners choose to gain access to a public medium.[22] The dial scanner may avoid exposure simply by turning the dial. The Commission itself has recognized that listeners do not possess any right to be free from all unpleasantness.[23] In its effort to shield children from language which is not too rugged for many adults the Commission has taken a step toward reducing the adult population to hearing or viewing only that which is fit for children. The Commission's *Order* is a classic case of burning the house to roast the pig. *See Butler v. Michigan,* 352 U.S. 380, 383, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957).

As defined by Congress, and refined by the FCC and the courts, public interest has always been understood to require li-

---

19. In addition, works of Auden, Becket, Lord Byron, Chaucer, Fielding, Greene, Hemingway, Joyce, Knowles, Lawrence, Orwell, Scott, Swift and the Nixon tapes, would not be allowed to air.

20. *Pacifica Foundation, supra* note 8.

21. *Rowan v. Post Office Dept.,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970).

22. *See Filthy Words, The FCC, and the First Amendment: Regulating Broadcast Obscenity,* 61 Va.L.Rev. 579 (1975).

23. Clarification of Section 76.256 of the Commission's Rules and Regulations, 59 F.C.C.2d 984 (1976).

censees to offer some balance in their program format. *See Renewal of Standard Broadcast and Television License*, 14 F.C.C.2d 1, 8 (1968). Obviously balanced programming requires more than just programs suitable for children. Speech cannot be stifled by the government merely because it would draw an adverse reaction from the majority of the people. *Bazaar v. Fortune*, 476 F.2d 570, 579 (5th Cir.), *modified*, 489 F.2d 225 (1973).

The Commission assumes that absent FCC action, filth will flood the airwaves. Thus the Commission argues that the alternative of turning the dial will not aid the sensitive person in his efforts to avoid filthy language. The *Order* provides no empirical data to substantiate this assumption. Moreover, the assumption ignores the forces of economics and of ratings on the substance of programming. Licensees are businesses and depend on advertising revenues for survival. The corporate profit motive and the connection between advertising revenue and audience size suggest that the dike will hold as long as the community remains actually offended by what it sees or hears.[24] Commentators and commissioners alike have noted that broadcast media require majorities, or at least sizeable pluralities, to pay the bills.[25] If they are correct, and if the Commission truly seeks only to enforce community standards, the market should limit the filth accordingly.[26]

## CONCLUSION

As we find that the Commission's *Order* is in violation of its duty to avoid censorship

24. *See Filthy Words, supra* note 22, at 615.

25. *Id. citing* N. Johnson, How to Talk Back to Your Television Set, 20–21 (1967); N. Minnow, Equal Time, The Private Broadcaster and the Public Interest.

26. *See Filthy Words, supra* note 22, at 615.
    As a final word we take note of a news account which, under the headline "Swearing by British Rock Band Enrages Television Viewers", reported the reaction of the British television audience to a broadcast containing filthy language. According to the report members of a rock band had used a string of obscenities on a London television program which had aired

of radio communications under 47 U.S.C. § 326 and that even assuming, arguendo, that the Commission may regulate non-obscene speech, nevertheless its *Order* is overbroad and vague, therefore we must reverse the *Order*. We should continue to trust the licensee to exercise judgment, responsibility, and sensitivity to the community's needs, interests and tastes. To whatever extent we err, or the Commission errs in balancing its duties, it must be in favor of preserving the values of free expression and freedom from governmental interference in matters of taste.

*So ordered.*

BAZELON, Chief Judge, concurring:

Although I agree with the result reached by Judge Tamm, I believe it is necessary to determine whether the Commission's *Order* abridges the First Amendment. I will discuss why this issue must be reached and then explain why the Commission's definition of "indecent" speech is unconstitutional.

### I.

Judge Tamm concludes that the Commission's definition of "indecent" must be invalidated because it authorizes censorship forbidden by 47 U.S.C. § 326. Section 326 provides that nothing in the Communications Act shall be understood as giving the Commission "power of censorship" or authority to "interfere with the right of free speech." I agree with Judge Tamm that

at 6:00 p. m. (The Washington Post, December 3, 1976, Style section, at 7, col. 2). Following the broadcast thousands of angry calls jammed the switchboard at Thames Television Studios and thousands of others were received by the London newspapers in protest of the broadcast. Thames Television broadcast an apology later the same evening and the host of the program planned to make a personal apology on the air the following evening. In this instance it seems rather clear that the London community was offended by what it had heard and that its reaction thereto stemmed any tide of filth that may have been headed its way.

the Commission has censored.[1] The Commission has banned the broadcast of certain words during all but the late night hours, and possibly during those times as well.[2] The statute is thus facially violated, even though the ban is not absolute (as the Commission puts it, objectionable speech has merely been "channeled" into certain hours).[3] By its terms, § 326 is not limited to rules that totally ban the broadcast of certain materials; it bans any Commission censorship.[4] Indeed, channeling may have substantially the same effect as an absolute ban. Channeling material into a small enough time slot would prevent many sta-

---

1. Unfortunately, I am unable to agree with Judge Tamm's related conclusion that the Commission customarily honors the limitations on its authority to regulate constitutionally protected speech. *See* WUHY–FM, 24 F.C.C.2d 408 (1970); Palmetto Broadcasting Co., 33 F.C.C. 250 (1962), *recon. denied*, 34 F.C.C. 101 (1963), *affirmed on other grounds sub nom. Robinson v. FCC*, 118 U.S.App.D.C. 144, 334 F.2d 534, *cert. denied*, 379 U.S. 843, 85 S.Ct. 84, 13 L.Ed.2d 49 (1964). *See also* Armond J. Rolle, 31 F.C.C.2d 533 (1970); the "raised eyebrow" harassment of KRAB–FM in Jack Straw Mem. Foundation, 21 F.C.C.2d 833, *hearing ordered on recon.*, 24 F.C.C.2d 266 (1970), *license renewed*, 29 F.C.C.2d 334 (1971); Mile High Stations, Inc., 28 F.C.C. 795 (1960); WREC Broadcasting Service, 19 F.C.C. 1082 (1955); Note, *Filthy Words, the FCC and the First Amendment: Regulating Broadcast Obscenity*, 61 Va.L.Rev. 579 (1975); Note, *Offensive Speech and the FCC*, 79 Yale L.J. 1343, 1349, 1359–68 (1970), and cases cited. Ironically, one case where the Commission honored the limitations on its authority involved the same licensee, Pacifica Foundation, 36 F.C.C. 147 (1964).

2. The ban is not limited to words "as broadcast," as the dissenter asserts, (draft at p. 1–2), for the *Order* provides that language that is indecent under the Commission's standard may never be broadcast when children are likely to be listening. Instead of merely considering the words "as broadcast," the Commission adopted a legislative-type rule which it then applied to the facts of the case. As the Commission itself noted, it issued a declaratory order in this case because such a procedure is "admirably suited to terminat[ing] the present controversy . . . and to clarify[ing] the standards which the Commission utilizes to judge 'indecent language.'" 51 F.C.C.2d at 434. It is true, though, that the adopted rule may not be applied at all times. During the late night hours, the *Order* cryptically states, a "different standard *might conceivably* be used." 51 F.C.C.2d at 433 (emphasis added). The *Order* does not specify at what time the number of children in the audience will be sufficiently low to permit use of a relaxed standard. However, the Commission's own statistics show that in Washington, D. C., teenagers comprise 14.1 percent between 11:00 p. m. and midnight. In re WUHY–FM, 24 F.C.C.2d 408, 411 n. 6 (1970). The Commission also found that in New York and Los Angeles, children of ages 11–17 comprise 13 percent of the 9:00 to 11:00 p. m. television audience, while those 6–11 comprise 5 percent. *Id.* This vagueness supports invalidation, not affirmation of the Commission's action.

The dissent recognizes that the Commission cannot constitutionally apply its rule at night when parents can supervise their children. (Dissenting draft at 10–11.) Under this logic, a similar conclusion would presumably be required when children are in school, possibly except during lunch hour and recess. The Carlin monologue was broadcast at 2:00 p. m. on Tuesday, October 30. *Order* at 431.

3. The Commission relies on *Williams v. District of Columbia*, 136 U.S.App.D.C. 56, 419 F.2d 638 (1969), and *Von Sleichter v. United States*, 153 U.S.App.D.C. 169, 472 F.2d 1244 (1972), for the proposition that regulation of offensive language should be governed by principles analogous to nuisance law. To the extent these cases permit a "nuisance" statute which proscribes words not obscene under *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), *see* text accompanying notes 7–9, *infra*, I think they are overruled by *Lewis v. City of New Orleans*, 415 U.S. 130, 134, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), and *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). In any event, the Commission misapprehends the meaning of "nuisance" as used in those cases. *Williams* and *Von Sleichter* do not hold that offensive words are a nuisance per se that can therefore be regulated. Rather, they relied heavily on the context in which the words were uttered, distinguishing the case of a stone-mason who, after dropping a stone on his foot, utters swear-words that can publicly be heard, from the case of a person who verbally, rather than physically, assaults a person in a public place.

4. The Senate Report regarding the 1948 amendment to § 326 states:

[S]ection 326 . . . makes clear that *the Commission has absolutely no power of censorship* over radio communications and that it cannot impose any regulation or condition which would interfere with the right of free speech by radio.
S.Rep.No.1567, 80th Cong., 2d Sess. 13014 (1948) (emphasis added).

tions from airing that material[5] and would effectively make it unavailable to many potential listeners.[6]

However, determining that the Commission has violated the literal command of § 326 does not, as Judge Tamm assumes, end the matter. Although the language of § 326 is very broad, the scope of that section is apparently limited by 18 U.S.C. § 1464 and 47 U.S.C. § 503(b)(1). Section 1464 provides criminal punishments for "[w]hoever utters any obscene, indecent, or profane language by means of radio," and § 503(b)(1) empowers the Commission to impose forfeitures on licensees who violated § 1464. In *Illinois Citizens Committee for Broadcasting v. F.C.C.*, 169 U.S.App.D.C. 166, 515 F.2d 397 (1974), the petitioners claimed that an obscenity forfeiture assessed by the Commission under the latter provisions violated both the First Amendment and § 326.[7] This court found that the Commission had properly found that the program was constitutionally unprotected obscenity under *Miller v. California*, 413

U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The forfeiture was upheld without comment on whether § 326 barred the Commission's action. The clear implication is that § 326 does not provide greater protection of speech than the First Amendment, at least with respect to offensive speech. If the court had thought otherwise, it could not have upheld the forfeiture simply by finding that the speech in question was unprotected under the First Amendment. Thus, to determine whether the Commission may regulate speech within its definition of "indecent," it is necessary to determine first whether such speech would be protected by the Constitution in other media; and if so, whether the unique character of broadcasting justifies the proposed expansion of government speech control.[8]

## II.

Several years ago, I felt compelled to write that "the FCC has demonstrated what one can most charitably describe as a

5. Amicus curiae, Committee for Open Media, San Francisco Chapter, asserts that roughly one-half of the nation's AM licensees (2,294 out of 4,488) operate only during the daytime. (Am.Br. at 18.)

6. If material could only be shown after midnight, it would be missed by many people who have already gone to sleep. According to Nielsen, 70 percent of television households watch television between 9:00 and 10:00 p. m., 46 percent at 11:00 p. m., and 25 percent at midnight. *Nielsen Television, 1975*, p. 7.

7. It is not entirely clear that the Commission is authorized to impose a forfeiture under § 503(b)(1) without a prior jury determination that § 1464 has been violated. The *Illinois Citizens Committee* court did not reach that issue. That appeal had been brought by a citizen group, rather than the fined licensee, and the court concluded the group lacked standing to raise the issue. 515 F.2d at 403 n. 13. The issue was not urged on this appeal. I merely note in passing that originally, the FCC was given enforcement powers over obscene broadcasts. *See Duncan v. United States*, 48 F.2d 128 (9th Cir.), *cert. denied*, 283 U.S. 863, 51 S.Ct. 656, 75 L.Ed. 1468 (1931). In 1948, the prohibition on obscene broadcasts was moved to Title 18 and nothing in Title 47 authorized the FCC to consider obscenity in a forfeiture proceeding. In 1960 Congress added § 503 to Title 47, Public Law 86–752, 74 Stat. 889. It

was not stated whether the FCC was to have coordinate enforcement power with the Department of Justice. In any event, imposition of a fine would have been preferable to the "raised eyebrow" tactic the Commission used here. The chilling effect of "associating" a finding of violation and threatening future unmentioned sanctions if the licensee's behavior does not improve is unmeasurable.

8. Although the Commission evidently assumes that § 1464 authorizes it to assert control over speech that would be forbidden in other media, 51 F.C.C.2d at 432, neither the text nor the legislative history of § 1464 supports this view. But regardless of Congress' intent in passing § 1464, the grant of power to the FCC cannot exceed the bounds of the First Amendment. I will assume that the First Amendment sometimes may permit government to regulate broadcast speech more tightly than other speech, and that § 1464 empowers the Commission to assert the maximum amount of control over offensive speech permitted by the Constitution. On these assumptions it is not necessary to define all the modifications, assuming there are any, in traditional First Amendment principles that may be justified by the unique character of broadcasting. It is only necessary to determine whether the additional regulation embodied in the Commission's definition of "indecent" is permissible.

total ignorance of the constitutional definition of obscenity." *Illinois Citizens Committee, supra,* statement of Bazelon, Chief Judge, as to why he voted to grant rehearing en banc, 515 F.2d at 418. Unfortunately, this case would seem to confirm that view. The Commission's definition of "indecent" speech that may be banned from the air-waves is massively overbroad under *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419, *rehearing denied,* 414 U.S. 881, 94 S.Ct. 26, 38 L.Ed.2d 128 (1973). Nor has the Commission demonstrated why offensive speech that otherwise would be protected may be regulated at all when broadcast over the airwaves—or, specifically why the additional restrictions imposed are tailored to serve the justifications relied on for regulation.

Regulation of obscenity has produced "a variety of views among the members of the [Supreme] Court unmatched in any other course of constitutional adjudication." *Interstate Circuit, Inc. v. Dallas,* 390 U.S. 676, 704–05, 88 S.Ct. 1298, 1314, 20 L.Ed.2d 225 (1968) (Harlan, J., concurring and dissenting). In *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), a majority of the Court, although aware that "ideas having even the slightest redeeming social importance . . . have the full protection" of the First Amendment, concluded that there was a category of obscene speech that could be freely regulated because it lacked redeeming social importance. 354 U.S. at 484–85, 77 S.Ct. at 1309. After *Roth,* a majority of the Court retained the belief that obscene speech lies outside the First Amendment, the Court

dividing over the difficult task of formulating a standard for distinguishing obscenity from that which is merely offensive. In the absence of a majority test, the Court initiated the practice, utilized thirty-one times, of summarily reversing convictions for the dissemination of materials that at least five Justices, applying their individual tests, found to be constitutionally protected. *Redrup v. New York,* 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967); *Miller,* 413 U.S. at 22, n. 3, 93 S.Ct. 2607. The Chief Justice believes this division of views "is not remarkable, for in the area of freedom of speech and press the courts must always remain sensitive to any infringement on genuinely serious literary, artistic, political or scientific expression." *Miller,* 413 U.S. at 22–23, 93 S.Ct. at 2614.

The Supreme Court's most recent attempt to resolve this uncertainty came in *Miller v. California, supra.* Acutely aware of the dangers inhering in any suppression of expression, the Court stated that the realm of permissible regulation must be "carefully limited." 413 U.S. at 23–24, 93 S.Ct. 2607. A jury may find a work obscene "under contemporary community standards" only if the work (1) when taken as a whole (2) appeals to the prurient interest, (3) portrays sexual conduct in a patently offensive way (4) and lacks serious literary, artistic, political or scientific value. 413 U.S. at 24, 93 S.Ct. 2607.[9] The Court further held that obscenity could be regulated only under a specifically defined law,[10] as written or authoritatively construed.[11] The Court said it had limited

---

**9.** The fourth prong represents the major departure from prior case law. Previously, proof of obscenity required establishing that the material was "utterly without redeeming social value," *Memoirs v. Massachusetts,* 383 U.S. 413, 419, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). The *Miller* majority abandoned this strict test on the ground that it required the prosecution to do the impossible, namely, to prove a negative. 413 U.S. at 22, 93 S.Ct. 2607.

**10.** The *Miller* framework was followed in companion cases to assess the validity of federal regulation, *United States v. 12 200-Ft. Reels of Film,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d

500 (1973); *United States v. Orito,* 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973).

**11.** To guide legislatures, the Court suggested two definitions of conduct that would satisfy the "patent offensiveness" prong of the test. The examples are:

(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals. 413 U.S. at 25, 93 S.Ct. at 2615. Judge Leventhal asserts that by including these examples

obscenity regulation to materials that "depict or describe patently offensive, 'hard core' sexual conduct." *Id.* at 27, 93 S.Ct. at 2616. *See also, Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 69, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1972).

The Commission did not find that the Carlin monologue was obscene under *Miller*. Rather, it found that certain words repeated in the monologue were "indecent." [12] The Commission offered several justifications for "authoritatively construing" the statutory term "indecent," one of which was a desire to reformulate its earlier construction of that term in light of *Miller*.[13] Although the Commission alternatively argues that *Miller* is not the exclusive test for regulation of offensive language, *see* Section III *infra*, analysis of the Commission's definition must begin with *Miller*. To begin with, *Miller* establishes when speech in other media may be regulated because it is offensive in a lewd or vulgar way, *see* note 22 *infra*. Furthermore, the Commission has in the past attempted to define indecency in terms of the Supreme Court's standard for obscenity, 51 F.C.C.2d at 433, and has theorized that unregulated, indecent speech will cause social harm similar to that which is commonly associated with unregulated obscenity.[14] Since the Supreme Court has

held that the concerns underlying obscenity justify only limited regulation, regulation of indecency must be subject to similar restraints absent other, compelling justifications.

Judge Leventhal's dissent is based in part on his view that the Commission attempted "to define 'indecent' in terms of the same underlying considerations as those which prompted the Supreme Court in *Miller*." (dissenting draft at 3). Although the motivations for regulating "indecent" and obscene speech do seem similar, the Commission's definition of indecency is massively over-broad under *Miller*. In fact, the Commission's definition disregards every *Miller* requirement but one.

To begin with, the Commission does not test the "indecency" of speech under "local community standards," but rather on the basis of what it terms "contemporary community standards for the broadcast medium." 51 F.C.C.2d 433. The search for a national standard is understandable. Justice Brennan's argument, rejected in *Miller*, that a national standard of obscenity is appropriate under a national constitution is telling. *See Jacobellis v. Ohio*, 378 U.S. 184, 193–95, 84 S.Ct. 1676, 12 L.Ed.2d 793. And

---

the Miller Court was authorizing "a stretch of the prohibition to go beyond the lewd obscene to the excretory indecent." (Dissenting draft at 4). This was not the Court's intent. Just one paragraph before it offered these examples of patently offensive behavior, the Court explicitly held that the standards for measuring obscenity are conjunctive—all must be met to suppress speech. By giving flesh to the meaning of "patent offensiveness," the Court was not abandoning this holding.

**12.** In constitutional interpretation the customary deference to agency regulations is inappropriate. *See e. g. National Broadcasting Co., Inc. v. FCC*, 170 U.S.App.D.C. 173, 516 F.2d 1101 (1974).

**13.** The Commission also cited *Illinois Citizens Committee, supra*, as a case that compelled reconsideration of an earlier definition of indecency. However, that case simply involved judicial review under *Miller*, the court expressly refusing to consider the constitutionality of that definition and application of the term "indecent." 515 F.2d at 403–04, n. 14.

**14.** The Supreme Court has never definitively explained the justification for regulation of obscenity. Professor Kalven listed five possible justifications, all of which he found troubling;

(1) the incitement to antisocial sexual conduct; (2) psychological excitement resulting from sexual imagery; (3) the arousing of feelings of disgust and revulsion; (4) the advocacy of improper sexual values; and (5) the impact of obscenity on character and hence, slowly and remotely, on conduct.

Kalven, *Metaphysics of the Law of Obscenity*, 1960 S.Ct.Rev., 1. Little would be served by charting the history of the Supreme Court's acceptance or rejection of these and conceptually similar concerns. All that bears noting is the similarity of the Commission's fears regarding unregulated indecent speech:

Obnoxious, gutter language describing these matters [sexual and excretory activities or organs] has the effect of debasing and brutalizing human beings by reducing them to their mere bodily functions. . . .

51 F.C.C.2d at 433. The Commission offered no empirical support for this proposition.

*Miller* can be read as merely holding that application of local standards is constitutionally permissible rather than constitutionally required. 413 U.S. at 30–39, 93 S.Ct. 2607. Finally, it may be that only a national standard is administratively feasible for the Commission. When scrutinized closely, however, the Commission's national standard appears chimerical. The Commission never solicited a jury verdict or expert testimony.[15] Nor did it rely on polls or letters of complaint.[16] The Commission simply recorded its conclusion that the words were indecent, thereby creating the suspicion that its national standard is in fact either the composite of the individual Commissioner's standards or what they suppose are the national standards.

The Commission's definition of indecency also disregards or distorts each of the other *Miller* requirements. First, appeal to the prurient interest is not to be considered. Second, a work is not judged as a whole. Rather, a work is banned if it contains "obnoxious, gutter language" that could be used offensively to describe sexual or excretory activities or organs. 51 F.C.C.2d 433.[17] Finally, a work containing indecent language cannot be broadcast even if the entire work has tremendous overriding literary, artistic, political or scientific value. *Id.*[18]

The only *Miller* requirement observed by the Commission is that the banned language be patently offensive. But uprooting this element from the others distorts its meaning. Under the Commission's definition, its *Order* could not itself be read over the airwaves even though it is not obscene under *Miller*. The *Order* has no appeal to the prurient interest and, as a whole, has serious value. Despite this, it would be banned because it contains words the Commission claims "debas[e] and brutaliz[e] human beings by reducing them to their mere bodily functions." 51 F.C.C.2d at 433.

The Commission's definition of indecent speech that may be freely regulated thus goes well beyond *Miller* and is prima facie unconstitutional, notwithstanding the Commission's attempts to minimize the significance of the *Order*. In addition to its point about channelling, *see* text and notes at notes 1–6 *supra*, and its claim that only a few words will be affected, the Commission disclaimed any intent "to stifle, robust, free debate." 51 F.C.C.2d at 434. The implication is that only words and not ideas are being suppressed. However, the Supreme Court has rejected this very argument. "[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process." *Cohen v. California*, 403 U.S. 15, 26, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1970). Since words "are often chosen as much for their emotive as cognitive force," *id.*, a person's choice of words is an important and protected ele-

---

**15.** Although a jury verdict is evidently not required in obscenity cases in general, *Alexander v. Virginia*, 413 U.S. 836, 93 S.Ct. 2803, 37 L.Ed.2d 993 (1973); *Illinois Citizens Committee, supra*, 515 F.2d at 406, it would seem to be an exceptionally sturdy mechanism for soliciting community standards.

**16.** I seriously doubt, in any event, that letters of complaint would provide reliable guidance as to what offends national standards of obscenity. Since a person is more apt to write a letter concerning a broadcast he finds offensive than one he does not, even a significant number of complaints might only reveal the sentiments of only a small minority of viewers.

**17.** Carlin's use of the "dirty words" was designed in part to demonstrate that they have acquired many popular meanings, apart from their literal meanings. For example, the phrase "I'm shit-faced" has nothing to do with

an excretory activity or organ. It means, "I am drunk." The irony of the *Order* is that non-"obnoxious" synonyms for the dirty words (such as "feces" for "shit") are not banned even though such synonyms are only understood in their literal, "obnoxious," sense.

**18.** Judge Leventhal argues that judicial review of Commission obscenity determinations compensates for the missing jury because

[j]udicial review would ensure the protection afforded by the Constitution to works professing literary, artistic, political or scientific value.

(dissenting draft at 9). This statement is puzzling because, except possibly during the late night hours, a work containing indecent speech is banned regardless of its social value. 51 F.C.C.2d 433.

ment of the overall message sought to be communicated.

The Commission euphemistically characterizes its definition of indecency as "variable obscenity," citing *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195. Under variable obscenity, the state can regulate dissemination of material to children that is obscene as to them, though not obscene as to adults. Variable obscenity "simply adjusts the definition of obscenity 'to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests . . . .' of such minors." *Ginsberg*, 390 U.S. at 638, 88 S.Ct. at 1279, citations omitted. Even assuming that variable obscenity can be regulated under § 1464, the Commission's definition of indecency is not a proper application of that concept.[19] To illustrate, the Commission did not purport to find that the Carlin monologue, when taken as a whole, appeals to the prurient interests of minors or that it was without serious value to minors. And even if the Commission had properly found that the monologue came within this definition, that finding alone would not justify absolute or near absolute suppression; the material might not be ob-

scene as to adults. Regulation of speech that is obscene as to children but that adults are constitutionally entitled to hear would present difficult problems of accommodation, problems that the Commission has not squarely faced because of its assumption that its broad regulation of indecent speech is constitutional.[20]

In sum, the tight limits on obscenity regulation carefully formulated by the Supreme Court in *Miller* have been thoroughly disregarded. The Commission's definition can be affirmed only if, as it alternatively argues, there exists an additional category of offensive speech that is unprotected when broadcast.

### III.

According to the Commission, certain qualities unique to the broadcast medium justify suppression of otherwise constitutionally protected speech.[21] Conceptually, the Commission's claim is that speech meeting its definition of "indecent" constitutes, when broadcast, an additional, previously unrecognized category of unprotected speech.[22] No single Supreme Court decision

19. *See* note 30 *infra*.

20. The *Order* bans indecent speech whenever it is "reasonably likely" that children will be in the audience, which is all but the late night hours. Consequently, protected speech will not reach all who have a right to hear it, unless they are willing to forego sleep. *See Young v. American Mini Theatres*, 96 S.Ct. 2453, 2455 (1976) (Powell, J., concurring). *See* note 30 *infra*.

21. 51 F.C.C.2d at 432. The Commission relied on the following language from *Burstyn v. Wilson*, 343 U.S. 495, 502–03, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952):
    [E]ach method [of expression] tends to present its own peculiar problems.
The Commission evidently concludes from this statement that different First Amendment standards govern regulation of speech in different media. However, the entire passage reads:
    [E]ach method tends to present its own peculiar problems. But the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary.

22. Supreme Court authority suggests that obscenity is to be the sole category of speech that is unprotected because it may offend the sensi-

bilities of listeners. First of all, the Court's twenty-year struggle to define obscenity suggests that the Court does not intend to recognize an additional category under a different heading. Furthermore, beginning with *Roth*, the Court has used the term "obscenity" as a legal short-hand to describe what government may constitutionally regulate under statutes that proscribe, for example, "obscene, lewd, lascivious, or filthy [books] of an indecent character." *Roth*, 354 U.S. at 476, n. 1, 77 S.Ct. at 1306. *See, e. g., Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. 12 200-Ft. Reels of Super 8mm Film*, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); *Manual Enterprises, Inc. v. Day*, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962). Furthermore, there is an abundance of dicta in the Supreme Court's cases supporting this suggestion.

*Miller* furnishes several examples:
    The States have a legitimate interest in prohibiting dissemination of exhibition of obscene material . . . . It is in this context that we are called upon to define the standards which must be used to identify . . . [what] a State may regulate.

directly forecloses this argument. However, considerable guidance is contained in the several opinions in which the court has considered conceptually similar justifications. All of the relevant case law directly opposes the action under review.

### A. Offensive speech may offend the privacy interests of unconsenting adults in their homes

Two of the characteristics cited by the Commission are so closely intertwined that they should be considered together. The Commission fears that "unconsenting adults may tune in a station without any warning that offensive language is being or will be broadcast." It then observes that radio receivers are typically found in the home, where privacy interests are especially high, citing *Rowan v. Post Office Dept.*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970). Since warnings can be aired prior to the broadcast of offensive material, the Commission evidently believes an adult listener should be able to indiscriminately scan the dial without chancing upon a program, even momentarily, he finds offensive.[23]

"The plain, if at times disquieting, truth is that in our pluralistic society, constantly proliferating new and ingenious forms of expression, 'we are inescapably captive audiences for many purposes.'" *Erznoznik v. City of Jacksonville*, 422 U.S. 205–210, 95 S.Ct. 2268, 2273 (1974). Nevertheless, the Supreme Court has consistently held that the First Amendment generally prohibits government from "cleans[ing] public debate to the point where it is gramatically palatable to the most squeamish among us." *Cohen*, 403 U.S. at 25, 91 S.Ct. at 1788. In *Erznoznik*, for example, the Court held that a city ordinance banning the showing of movies containing nudity on drive-in screens visible from the street could not be

---

413 U.S. at 19–20, 93 S.Ct. at 2612.
> We acknowledge, however, the dangers inherent in undertaking to regulate any form of expression. State statutes designed to regulate obscene materials must be carefully limited. . . . As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct.

*Id.* at 23–24, 93 S.Ct. at 2614. And:
> Under the holdings announced today, no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct . . . .

*Id.* at 27, 93 S.Ct. at 2616.

The implication of these and similar statements is that permissible regulation of offensive speech is co-extensive with *Miller*.

Finally, in several cases, perhaps best represented by *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), the Court has overturned convictions based on offensive speech. In *Cohen*, a young man was prosecuted for walking through a courthouse wearing a jacket bearing the slogan "fuck the draft" and was convicted under a California statute that proscribed "maliciously and wilfully disturb[ing] the peace or quiet of any neighborhood or person . . . by . . . offensive conduct." Finding that the case did not involve obscenity, fighting words, a captive audience or any other category of speech that may be regulated, the Court was squarely faced with the question of whether the state could regulate words simply because they were offensive. The Court stated that offensive language

was a necessary side effect of promoting the broader First Amendment value of open-ended debate and that the "principle [of selective suppression] contended for the State seems inherently boundless." 403 U.S. at 25, 91 S.Ct. at 1788. It concluded that Cohen's conviction was unconstitutional. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (display of nudity on a drive-in movie screen); *Lewis v. City of New Orleans*, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (utterance of vulgar epithet); *Hess v. Indiana*, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (utterance of vulgar remark); *Papish v. University of Missouri Curators*, 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (indecent remarks in campus newspaper); *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (utterance of racial slurs); or *Kingsley Pictures Corp. v. Regents*, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (alluring portrayal of adultery as proper behavior). *Cf. Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), where a majority of the Court did not endorse the proposition that offensive though non-obscene expression may be regulated in some ways if not altogether banned.

**23.** According to the Commission, millions scan the dial every day. *Sonderling Broadcasting Corp.*, 27 P&F RR 2d 285, 288, *recon. denied* 41 F.C.C.2d 777 (1973), *affirmed sub nom. Illinois Citizens Committee for Broadcasting, supra*; *WUHY–FM, Eastern Educ. Radio.* 24 F.C.C.2d 408, 411 (1970).

upheld in order to protect the sensibilities of involuntary passers-by. The Court said those who were offended could simply "avert their eyes." 422 U.S. at 211, 212, 95 S.Ct. 2268. Similarly, in *Cohen, supra* n. 22, the Court held that offensive language could not be proscribed to protect the sensibilities of persons who might involuntarily be exposed to it:

> [T]he ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections.

403 U.S. at 23–34, 91 S.Ct. at 1786.

In *Cohen,* as in *Erznoznik,* the Court held the invasion on the privacy of unwilling viewers was not "intolerable" because of their ability to avert their eyes.

The Commission evidently believes that radio broadcast of offensive language constitutes an "intolerable invasion of substantial privacy interests." Radio waves are, as the Commission suggests, "intrusive" in some sense. They are "in the air" whether we like it or not.[24] But radio waves are not intrusive in the same sense as "raucous emissions of sound trucks blaring outside . . . residences," which was cited as an example of an "intolerable invasion" in *Cohen,* 403 U.S. at 21, 91 S.Ct. at 1786.[25] Unlike the sound truck whose noise cannot be eliminated from the home even if desired, radio makes no sound unless a person voluntarily purchases it, bring it home and then switches it "on." Having done these things, having elected to receive public air waves, the scanner who stumbles onto an offensive program is in the same position as the unsuspecting passers-by in *Cohen* and *Erznoznik;* he can avert his attention by changing channels or turning off the set.[26]

There is language in *Cohen,* however, "that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue, *e. g. Rowan v. Post Office Dept.,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970)." 403 U.S. at 21, 91 S.Ct. at 1786. Although relied on by the Commission, *Rowan* does not in fact justify its *Order.* As the enunciation of the relevant test, citation of *Rowan,* and discussion of examples in *Cohen* suggest, *id.* at 21–22, 91 S.Ct. 1780, the location of the

---

24. In its brief, the Commission quotes the following language from my opinion in *Banzhaf v. FCC* for the proposition that broadcast audience are "captive":

> Written messages are not communicated unless they are read; and reading requires an affirmative act. Broadcast messages, in contrast, are 'in the air.'

132 U.S.App.D.C. 14, 405 F.2d 1082, 1100–1101 (1968), *cert. denied,* 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969).

*Banzhaf,* however, is totally inapposite. The *Banzhaf* court relied squarely on the announced policy of both the executive and legislative departments, which were themselves based on convincing evidence, that cigarettes are carcinogens. Hence the court weighed a relatively minor intrusion on free speech against an officially documented threat against life itself, 405 F.2d at 1097–99. Furthermore, the case was not based on a captive audience rationale; the court merely suggested that a television viewer must make an affirmative effort to disregard the commercial interruptions on a program he is watching. *Id.* at 1100.

25. The Court has in other cases added that while it is permissible to regulate the raucous emissions of sound trucks on the theory that people are entitled to have the tranquility and privacy of their homes protected from intrusions which they are themselves powerless to prevent, governmental regulation of the "time, place and manner" of expression must be content-neutral. *Police Dept. of City of Chicago v. Mosley,* 408 U.S. 92, 99, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Erznoznik, supra; Shuttlesworth v. City of Birmingahm,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Saia v. New York,* 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948); *Martin v. City of Struthers,* 319 U.S. 141, 151, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (Murphy, J., concurring).

26. In *Lehman v. City of Shaker Heights,* 418 U.S. 298, 302, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974), the Court noted, "The radio can be turned off, but not so the billboard or street car placard," *quoting Packer Corporation v. Utah,* 285 U.S. 105, 110, 52 S.Ct. 273, 76 L.Ed. 643 (1932).

unwilling listener is only one factor to be considered in determining whether speech is protected. Although a person *can* claim a greater privacy interest when at home, that interest is reduced when he "opens up his home" by turning on the radio. Indeed, when walking on the street one rarely receives prior warning of an offensive conversation.

Furthermore, the Commission's action is of an entirely different nature than that upheld in *Rowan.* There the Court upheld the constitutionality of a statute which enabled a person to require that a mailer remove his name from its mailing lists and stop all future mailings to the householder.[27] *Rowan* enables a person who is offended by mail sent from a certain source to avoid further offense from that source. This privacy interest is similar to that naturally enjoyed by the radio listener—the right not to listen to stations he finds offensive. The *Rowan* Court noted that similarity of these interests when it wrote that invalidating the statute,

> would tend to license a form of trespass and would make hardly more sense than to say that a radio or television viewer may not twist the dial to cut off an offensive or boring communication and thus bar its entering his home.

397 U.S. at 737, 90 S.Ct. at 1490. More importantly, as the *Rowan* Court noted, by empowering the homeowner to determine what mail he will not receive, Congress avoided the Constitutional problems involved in "vesting the power to make any discretionary evaluation of the material in a governmental official." *Id.* The Commission, by assuming this very power, has gone well beyond *Rowan.*

B. Presence of Children in the Radio Audience

The argument advanced most strenuously by the Commission is that the ban on "dirty words" is necessary to prevent "the expo-

sure of children to language which most parents regard as inappropriate for them to hear." 51 F.C.C.2d at 433. The Commission theorizes that regulation is necessary because parents will frequently be unable to shield their children from such programming. No one would dispute that there is a public interest in stations airing programming suitable for children or that government has greater power to regulate speech aimed at children than speech aimed at adults, *Ginsberg v. New York, supra.* However, it does not follow that the regulation under review is permissible.

First of all, the Commission incorrectly assumes that material regulatable for children can be banned from broadcast.[28] In *Butler v. Michigan,* 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957), the Court invalidated a state statute that absolutely banned the publication, sale or distribution of reading materials inappropriate for children. The Court said,

> The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children. It thereby arbitrarily curtails one of those liberties of the individual . . . that history has attested as the indispensable conditions for the maintenance and progress of a free society.

352 U.S. at 383–84, 77 S.Ct. at 526.

The Commission's *Order* has substantially the same effect. Adults with normal sleeping habits will be limited to programs "fit for children." Should the Commission choose to regulate variable obscenity in the future, it must accommodate the right of government to regulate material that is obscene as to children with the rights of adults to hear speech protected as to them. If the Commission finds it impractical to accommodate these interests, any regulation must err on the side of under- rather than over-regulation. Any harm from under-regulation may be minimized by pre-

---

**27.** 39 U.S.C. § 4009 (1964 ed., Supp. IV).

**28.** Since the *Order* only states that a more relaxed standard "might conceivably be used" during the late night hours, *see* note 2 *supra,* I assume the Commission believes it could impose an absolute ban. Nevertheless, for the rest of this paragraph I will assume the Commission will allow "indecent" speech to be aired late at night.

program warnings and parental supervision. Any harm from over-regulation, on the other hand, is irremediable.

In any event the Commission has not shown that the proposed regulation is permissible even with respect to children. Its position is based on several undocumented assumptions. The most basic assumption is that most parents consider any mention of dirty words to be unsuitable for their children. On top of this, the Commission assumes that parents frequently are unable to control their children's listening habits. A critical additional assumption (which I find difficult to accept) is that parents are less able to control their children's access to television and radio than to such media as books and newspapers. If this assumption is unfounded, then the major support for the Commission's argument that radio-TV should be distinguished from other media for speech regulation purposes is groundless.

Moreover, even if valid, those assumptions do not validate the *Order* since it rests on the premise that the Commission may censor material found by parents to be objectionable for their children. This unprecedented assumption [29] "seems inherently boundless," *Cohen*, 403 U.S. at 25, 91 S.Ct. 1780. Parents might also wish to shield their children from programs advancing controversial political or religious beliefs or programs discussing difficult contemporary problems such as abortion. If the Commission can act *in loco parentis* by banning dirty words because they are objectionable, then the same logic justifies a ban on these and other types of programs.

Many parents believe—and perhaps rightly so—that children should not hear programs containing dirty words, and they may, of course, prevent their children from doing so. However, the Constitution limits the government's power to select programming for children. Although government may adopt more stringent controls with respect to children than adults on the theory that children lack the full capacity for choice that is the presupposition of First Amendment guarantees, *Ginsberg v. New York, supra, esp.* (Stewart, J. concurring), 390 U.S. at 649–50, 88 S.Ct. at 1285, "[m]inors are entitled to a significant measure of First Amendment protection . . . and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik, supra,* 422 U.S. at 212, 95 S.Ct. at 2274. See also *Tinker v. Des Moines School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In fact,

> Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable.

*Erznoznik,* 422 U.S. at 213–14, 95 S.Ct. at 2275.

Thus the *Order* is clearly overbroad insofar as it is based on protection of children. As noted above, *see* text and note at note 19 *supra,* the Commission cannot plausibly claim that speech meeting its definition of "indecent" satisfies the constitutional test of obscenity, even as adjusted for children. In order to find that dirty words were obscene as to children, the Commission would at least have to find that their use, in context, appeals to youthful prurient interest. This has not been done and, frankly, I do not see how individual words could ever be found obscene, even as to children.[30]

---

**29.** The Commission improperly relies upon *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), where the Supreme Court held that an Amish parent's decision not to send his children to secondary school for religious reasons was constitutionally protected. *Yoder* recognizes that parents are entitled to make certain decisions respecting their children. This interest is infringed rather than promoted by the Commission's *Order* which replaces parental authority with governmental authority.

**30.** *Ginsberg v. New York, supra,* which established the principle that obscenity could be assessed in relation to children, was decided before *Miller.* In *Erznoznik* the Court observed it had not had occasion to determine the effect of *Miller* on *Ginsberg.* However, the Court stated that not all nudity could be regarded as obscene as to children, because to be obscene

Nor can this broad restriction be justified by any other governmental interest pertaining to minors. In fact, the Commission's motivation in protecting children from dirty words is essentially that which *Erznoznik* forbids, namely a desire to shield children from what the legislature deems offensive.

In reaching this conclusion, I am not championing the "cause" of indecent speech. The use of dirty words on the air, like the prevalence of violence, is a serious concern. Without a heightened sensitivity of the media, the pressure on First Amendment values will continue to grow. Violence in programming, however, may be more objectionable than the use of off-colored language; after all, children do not learn to kill each other with dirty words. Nevertheless, the Commission recently refused to ban violence on television, citing First Amendment concerns. *Report on the Broadcast of Violent, Indecent, and Obscene Material*, 51 F.C.C.2d 418, 420 (1975).

## C. Scarcity of Spectrum Space

The final feature of broadcasting relied on by the Commission is the natural scarcity of broadcast channels. This reliance is misplaced. The ban on censorship in 47 U.S.C. § 326 reflects a Congressional judgment that scarcity does not justify content regulation. Indeed, although scarcity has justified *increasing* the diversity of speakers and speech, it has never been held to justify censorship.

The Commission relies on *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), where the Supreme Court upheld the constitutionality of the personal attack and political editorializing portions of the Commission's fairness doctrine. There the Court balanced

the interests of broadcasters in freedom from control against the public's right to receive diverse viewpoints on matters of political importance. In this case, on the other hand, there is no divergence of First Amendment interests. The broadcasters' interest in freedom from content regulation is not incompatible with each member of the broadcast audience's interest in selecting his own programs and perhaps thereby attempting to influence the broadcaster's offerings. In fact, the *Red Lion* Court anticipated this situation when it wrote:

> There is no question here of the Commission's refusal to permit the broadcaster to carry a particular program or to punish his own views; . . . of government censorship of a particular program contrary to § 326; or of the official government view dominating public broadcasting. Such questions would raise more serious First Amendment issues.

395 U.S. at 396, 89 S.Ct. at 1810.

### D. Miscellaneous Justifications

The Commission also advances several subsidiary justifications for its action that are easily put aside. First, as Judge Tamm observes, the fear that filth will flood the airwaves without Commission regulation ignores economics. Popular tastes should be sufficient to ensure that the populace is not inundated with programming it finds objectionable.

Nor can the Commission's actions rest on its statutory obligation to promote the larger and more effective use of radio in the public interest. 47 U.S.C. § 303(g). The Commission's statutory authority is not superior to the First Amendment. At most, specific components of the public interest can be relied on, as the Commission sought to do, to justify modifications in established First Amendment principles.

expression must be in some way erotic. 422 U.S. at 213, n. 10, 95 S.Ct. 2268. This statement implies that a finding of variable obscenity requires at least that the offensive material be judged in context and found to be prurient. In fact, there is language in *Miller* suggesting that the presence of children does not justify any additional regulation of speech:

> This Court has recognized that the States have a legitimate interest in prohibiting dis-

semination of obscene material when the mode of dissemination carries with it a significant danger of offending the sensibilities of unwilling recipients or of exposure to juveniles. (Cites omitted). *It is in this context,* that we are called on to define the standards which must be used to identify obscene material that a State may regulate . . .

413 U.S. at 19–20, 93 S.Ct. at 2612 (emphasis added).

Finally, support for the Commission's action cannot be found in the fact government could have denied the public access to the airwaves altogether. I have long found such an argument puzzling. *See Brandywine-Main Line Radio, Inc. v. FCC*, 153 U.S.App.D.C. 305, 473 F.2d 16, 67–68 (Bazelon, C. J., dissenting); Emerson, *The System of Freedom of Expression*, 660–61 (1970). Government also owns parkland and other facilities commonly used as public fora. Although the government may, in certain circumstances, forbid the use of certain locations altogether for public dialogue, any regulation it employs once it opens up a particular location for speech purposes must be content neutral. *Police Dept. of City of Chicago v. Mosley, supra; Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).

## CONCLUSION

The impact of television [31] and radio has grown at an astonishing rate, and broadcasting promises to become by far the most influential medium of communications in our society. As its power continues to grow, preservation of free speech will hinge largely on zealously protecting broadcasting from censorship. As Chief Justice Warren

31. The Commission construes § 1464 as applying to spoken words that are broadcast. Thus § 1464 applies to television dialogue. The Commission has asked Congress to update the statute to refer explicitly to video depiction. *Report on Violen[ce], supra,* 51 F.C.C.2d at 424.

1.                 CONCLUSION

14. Applying these considerations to the language used in the monologue broadcast by Pacifica's station WBAI, in New York, the Commission concludes that words such as "fuck," "shit," "piss," "motherfucker," "cocksucker," "cunt" and "tit" depict sexual and excretory activities and organs in a manner patently offensive by contemporary community standards for the broadcast medium and are accordingly "indecent" when broadcast on radio or television. These words were broadcast at a time when children were undoubtedly in the audience (i. e., in the early afternoon). Moreover, the pre-recorded language with the words repeated over and over was deliberately broadcast. We therefore hold that the language as broadcast was indecent and prohibited by 18 U.S.C. 1464. Accordingly, the licensee of WBAI–FM could have been the subject

once observed, the impact of a particular medium constitutes no basis for subjecting that medium to greater suppression:

This is the traditional argument made in the censor's behalf; this is the argument advanced against newspapers at the time of the invention of the printing press. The argument was ultimately rejected in England, and has consistently been held to be contrary to our Constitution. No compelling reason has been predicated for accepting the contention now.

*Times Film Corp. v. City of Chicago*, 365 U.S. 43, 77, 81 S.Ct. 391, 409, 5 L.Ed.2d 403 (1969) (Warren, C. J., dissenting).

LEVENTHAL, Circuit Judge, dissenting:

The Commission's declaratory order was issued in FCC File No. BRH–13, *In the Matter of a Citizen's Complaint Against Pacifica Foundation, Station WBAI (FM) New York, New York*. The Declaratory Order consists of sixteen numbered paragraphs, followed by an Ordering paragraph. In the footnote I set out the Commission's *Conclusion,* which contains the three final numbered paragraphs, together with the Ordering paragraph.[1] The majority vacates the order. I dissent.

of administrative sanctions pursuant to the Communications Act of 1934, as amended. No sanctions will be imposed in connection with this controversy, which has been utilized to clarify the applicable standards. However, this order will be associated with the station's license file, and in the event that subsequent complaints are received, the Commission will then decide whether it should utilize any of the available sanctions it has been granted by Congress. See footnote 3 above.

15. There are several reasons why we are issuing a declaratory order instead of a notice of apparent liability as we did in *WUHY–FM* and *Sonderling*. A declaratory order is a flexible procedural device admirably suited to terminate the present controversy between a listener and the station, and to clarify the standards which the Commission utilizes to judge "indecent language." See 5 U.S.C. 554(e), and 47 C.F.R. 1.2. Such an order will permit all persons who consider themselves aggrieved or who wish to call additional factors to the Commission's attention to seek reconsideration. 47 U.S.C. § 405. If not satisfied by the Commission's action on reconsideration, judicial review may be sought immediately.

The Appendix to this opinion contains the transcript of the George Carlin record. It may offend some sensibilities. But I think it important, especially because so many may be disposed to consider the matter in absolutist terms, to know what material it is that the Commission has held was improperly broadcast in the afternoon. This transcript is written, and it may well be more heavy handed than the monologue as heard on the radio. But counsel have not complained that the transcript format distorts or fails to present the issues.

I

The majority opinions treat the FCC's order as though it prohibited any TV or radio broadcast which included one of the seven words identified in the FCC's paragraph 14. The Commission held only "that the language *as broadcast* was indecent and prohibited by 18 U.S.C. § 1464".[2] The words were identified as depicting "sexual activities and excretory activities and organs in a manner patently offensive by contemporary community standards for the broadcast media", and further identified as "prerecorded language with the words repeated over and over . . . deliberate-

ly broadcast." But over and above the Commission's focus on the deliberate repetition of these words, was a clear and crucial emphasis on the timing of the broadcast. It was vital to the order that the words were broadcast "in the early afternoon" when "children were undoubtedly in the audience." The order specifically stated that the prohibition of the "broadcast of 'filthy words' considered indecent particularly when children are in the audience" would not force on the general listening public ideas "fit only for children."

Commissioners Reid and Quello stated that in their view the declaratory order should have gone further and prohibited such language at any time of the day or night. That was a minority expression. Chairman Wiley concurred only in the result. Commissioner Robinson, joined by Commissioner Hooks, concurred on the ground of time limitation, as a reasonable measure "to insist that programming of a kind whose broadcast to children would be thought inappropriate be confined to hours of the evening in which children would not ordinarily be exposed to the material—or at least not without the supervision of a parent."[3]

16. This order is issued not only pursuant to 18 U.S.C. § 1464 but also in furtherance of our statutory obligation to promote the larger and more effective use of radio in the public interest. 47 U.S.C. § 303(g). It is not intended to stifle robust, free debate on any of the controversial issues confronting our society. That debate can continue unabated. Prohibiting the broadcast of "filthy words" considered indecent particularly when children are in the audience will not force upon the general listening public debates and ideas which are "only fit for children." First, the number of words which fall within the definition of indecent is clearly limited. Second, during the late evening hours such words conceivably might be broadcast, with sufficient warning to unconsenting adults provided the programs in which they are used have serious literary, artistic, political, or scientific value. In this as in other sensitive areas of broadcast regulation the real solution is the exercise of licensee judgment, responsibility, and sensitivity to the community's needs, interests and tastes. *Programming Policy Statement,* 25 Fed.Reg. 7291, 20 Pike & Fischer 1901 (1960); *Stone v. FCC,* 151 U.S.App.D.C. 145, 466 F.2d 316 (1972); *Yale Broadcasting Co. v. FCC,* 155 U.S.App.D.C. 390, 478 F.2d 594, *cert.*

*denied,* 414 U.S. 914, 94 S.Ct. 211, 38 L.Ed.2d 152 (1973). The Commission's failure to set forth its position could lead to widespread use of indecent language on the public's airwaves, a development which would (1) critically impair broadcasting as an effective mode of expression and communication, (2) ignore the rights of unwilling recipients, and (3) ignore the danger of exposure to children. We do not propose to abdicate our responsibility to the public interest.

Accordingly, IT IS ORDERED, that the complaint filed December 3, 1973, against Pacifica Foundation, licensee of Station WBAI, New York, New York, IS GRANTED to the extent indicated above.

2. 18 U.S.C. § 1464 provides:

Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined not more than $10,000 or imprisoned not more than two years, or both.

3. Nothing herein is inconsistent with a rejection of any claim to be the "general censor" and guardian of the public morals in regard to broadcast communications. What we

In light of this array of concurrences, the Commission's decision must be read narrowly, limited to the language "as broadcast" in the early afternoon.

## II

Exposure to children marks a special enclave in the law of freedoms of publication. Even the dissent of Justice Brennan in *Miller v. California,* 413 U.S. 15, 47, 93 S.Ct. 2607, 37 L.Ed.2d 419, abstained from discussing state power over distribution to juveniles. As to children, it is obvious that the state has more latitude to require that certain movies, which are not censored generally, should nevertheless not be exhibited in performances to which children under 16 are admitted. The problem is that radio-TV broadcasting cannot be handled in so tailored a fashion.

In regard to broadcasting, the probable presence of children in the radio audience is relevant to a determination of obscenity. So we held in *Illinois Citizens Committee for Broadcasting v. FCC,* 169 U.S.App.D.C. 166, 173, 515 F.2d 397, 404 (1975).

> assert is a special power to protect the young—or, more precisely, people's views about what sort of material it is proper to expose to the young—a purpose which even hardbitten libertarians do not find entirely uncongenial.[12] Even here there is obviously
>
> [12] Even Mill, second to none in advocating a limited role for government, granted it broader role in regard to minors—those not "in the maturity of their faculties." *On Liberty,* reprinted in *Utilitarianism, Liberty and Representative Government,* p. 96 (Everyman ed. 1951). He also granted such a role to government in cases of "backward" societies, *Ibid.* I hope we do not qualify for that exception.
>
> need for caution, lest in our proper concern for protecting children of impressionable age from language to which they ought not to be exposed, we also undertake to regulate the tastes of adults. I am, however, satisfied that we can take reasonable measures short of censorship to channel programming where, as here, it is not adequately controlled to avoid casual listening by children. The principal means by which this can be achieved is to insist that programming of a kind whose broadcast to children would be though inappropriate be confined to hours of the evening in which children would not ordinarily be exposed to the material—or at least not without the supervision of a parent. Short of

The FCC opinion under discussion refers to what is "indecent" rather than what is "obscene." If the term "indecent" were stretched to cover what would normally be included as, say, sacrilegious, it would depart too far from the context of section 1464.[4] But as I read the FCC's order, it reflects an effort to define "indecent" in terms of the same underlying considerations as those which prompted the Supreme Court in *Miller.* In the last analysis, the FCC's opinion on what is "indecent" stands as a functional equivalent to the Supreme Court's current "obscenity" ruling (Miller), save for an adaptation to bridge the difference posed by the characteristic of radio presentation.

The majority opinions seem to consider "indecent" as a novel concept in the law, which should in their view not be extended beyond control of the "obscene." They wholly fail to take account of one aspect of *Miller,* which has not been much analyzed but which seems to me to have been deliberate and significant. The pre-*Miller* rulings had always defined "obscene" in terms

> an all-out ban on indecent or offensive programming during daytime hours we can also insist that suitable measures be taken to warn adults that possibly offensive programming is about to be presented. Beyond such modest controls, however, I would not proceed.

51 F.C.C.2d

### IV. CONCLUSION

On the premise advanced by Justice Holmes that "all rights tend to declare themselves absolute to their logical extreme," *Hudson Water Co. v. McCarter,* 209 U.S. 349, 355 [28 S.Ct. 529, 52 L.Ed. 828] (1908), there is no logical ground for compromise between the right of free speech and the right to have public utterance limited to some outside boundary of decorum. But while the conflicting claims of liberty and propriety cannot be reconciled, they can be made to coexist by *tour de force.* This agency, in my view, has the power to compel that co-existence in the limited scale we undertake today. I assent to it because I recognize that the only possible way to take a mediate position on issues like obscenity or indecency is to avoid dogmatism and its meretricious handmaiden, the Ringing Phrase, and to split the difference, as sensibly as can be, between the contending ideas.

4. *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952).

of what appeals to the lewd and prurient interest, see *e. g. Roth v. United States,* 354 U.S. 476, 487, 77 S.Ct. 1304, 1 L.Ed.2d 1498, for the concept that had previously been defined. But *Miller* expanded on this—to include "patently offensive representations or descriptions of . . . excretory functions." 413 U.S. at 25, 93 S.Ct. at 2615.[5] This is in substance a stretch of the prohibition to go beyond the lewd obscene to the excretory indecent. And that is the *only* increment given to the term "indecent" in the FCC's opinion and order.

Mr. George Carlin is a comedian of stature, and a social satirist, but it is in the nature of social satirists to be provocative. He himself delivered his words as a biting commentary on what could *not* be heard on radio-TV, but he delivered them in a theater. A mature audience might appreciate not only the particular paradox, but the ongoing dilemma, that every society has special vocabularies appropriate only for special groups, times and places. What the licensee did here was to broadcast them broadside, in houses and elsewhere; and to present the persistent, almost lavishly loving reiteration of the special words in an afternoon broadcast when children were likely in the audience. I cannot fault the FCC's order declaring that broadcast as indecent under 18 U.S.C. § 1464. TV-radio broadcasting has special access to the home, and home audiences are a primary target of the industry. In the home special considerations apply, with freedom from unwanted intrusion both by the government, *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), and by others presenting unwanted materials, *Rowan v. Post Office Dept.,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970).

A concept like "indecent" is not verifiable as a concept of hard science. Its acceptance by and application by the FCC does not necessarily reflect, or depend upon, a determination by the FCC that this material would be dangerous to the children. What it reflects is a determination concerning a broad consensus of society, the view that the great bulk of families would consider it potentially dangerous to their children, and the further view that in our society, with the family as its base block, it is the family that should have the means to make that choice. With the pervasiveness of TV-radio and its reach into the home the choice made by broadcasters precludes an effective choice by the family.

Because of the unique interest in home life, especially strong in homes where children are being raised, it is bootless to quote from cases that reflect a more permissive attitude to speech in public streets and places, without attention to the difference. In *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), there was a showing of a film in a drive-in theater, at night. Any children in the audience were not being reached at home. They had access only if, having been excluded from the theater, they sought out the film from a non-contemplated location. *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), was a case of emphatic political speech. The otherwise offensive protest occurred in the courthouse, basically an adult locale, open only during the day. The reality of broadcasting's special access to the home conjoins with the passivity of TV-radio reception—a mere click, without current purchase. Indeed there is passivity after the click, with TV-radio stations being frequently left to a dial position previously set, unless there is an "alert" of some kind.

5. The concept of appeal to the prurient interest had previously been justified in some quarters on the ground that the material might stimulate sexual activity. Obviously, the representation of excretory functions would not stimulate excretory activity. It might sexually stimulate some seriously disturbed persons, but so might any fetish, such as a shoe. While *Miller* and accompanying opinions discourse at length on the possible nexus of obscenity and antisocial behavior, in the last analysis they do not depend on a showing or assumption of antisocial activity, but rather reflect a judicial conception that the law may give sanctions to the community's effort to avoid degradation of its quality of life and imposition on the privacy of others. See *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 59, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), referring to the view of Professor Alexander Bickel.

## III

A crucial reality, dominating the case at hand, is the widespread access of radio to children. Radio is relatively inexpensive in initial capital cost, and virtually a free good in terms of operating expense. Widespread freedom of selection of programs by children is not only a condition, it is often a necessity. Today, a majority of families with school-age children have working mothers, and one out of five children in the United States live with only one parent, so that many children are at home unsupervised during the day.[6] In this totality of conditions, one cannot wave away the radio-TV problem on the ground that the (mature) person can readily switch the channel.

It is no objection to the validity of the Commission's declaratory order that its protection will not be complete. It is likely that children will hear these words somehow, somewhere, and even at a relatively early age, but it makes a difference whether they hear them in certain places, such as the locker room or gutter, or at certain times, that do not identify general acceptability.

It is argued that the FCC's order is meaningless, because many children listen to TV-radio unsupervised even late at night. A ban would not be proved invalid by a showing that in some homes the parents habitually use such language in front of their children. Similarly, a daytime ban is not invalid because some parents give their children freedom in late hours. That does not show the ruling is futile, for it may still provide protection to a large number of the households of America. Nor is it sound to say that partial control must logically end in total prohibition, at all times and for all audiences. Licensees have the ability to make time distinctions. *See* In re *Pacifica Foundation,* 36 F.C.C. 147, 149 (1964) (noting that "Pacifica took into account the nature of the broadcast medium when it scheduled [programs with sexual themes or indecent language] for the late evening hours (after 10 p. m., when the number of children in the listening audience is at a minimum").

The abhorrence of Censorship is a vital part of our society. But there is a distinction between the all-out prohibition of a censor, and regulation of time and place of speaking out, which still leaves access to a substantial part of the mature audience. What is entitled to First Amendment protection is not necessarily entitled to First Amendment protection in all places. *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). Nor is it necessarily entitled to such protection at all times.

Commissioner Robinson's apt citation of Justice Holmes [7] is rightly conjoined with a caution against the Ringing Phrase. We must beware of the distortion of doctrines and concepts that are pushed to extremes. In affirming the FCC's order, we would not be condoning a censorship that put the message of Mr. George Carlin off the air.[8] We

---

**6.** Smithsonian, Feb. 1977, p. 13 (noting that "most kids are latchkey children"). *See also* N.Y. Times, Feb. 10, 1977, at 39, Col. 3 (City ed). The most recent data appear in Bureau of the Census, Dep't of Commerce, *Marital Status and Living Arrangements: March 1976,* Series P–20 No. 306, at 7 (January 1977):

Eighty percent of the children under 18 years old in 1976 lived in families with both of their parents present, a decline from 85 percent in 1970.

*See also* U.S. Dep't of Labor, *News Release* (February 25, 1977) (majority of children between ages of 6 and 17 have mothers in the labor force).

**7.** *Hudson Water Co. v. McCarter,* 209 U.S. 349, 355, 28 S.Ct. 529, 52 L.Ed. 828 (1908). ("All rights tend to declare themselves absolute to their logical extreme.")

**8.** Moreover, it seems to me implicit in the Commission's order prohibiting the language "as broadcast" that the Commission does not intend to ban from the afternoon air waves every work of literature which contains one of these words. The monologue broadcast here was an exploration of obscenity, "with the words repeated over and over." FCC Conclusion at ¶ 14. It was very different from the plays of Shakespeare or the novels of Fielding, which may occasionally include, in the course of dealing with some larger theme, a word customarily indecent, and would be so regarded if not redeemed by the literary, artistic, political, or scientific context.

would be authorizing reasonable steps that permit that message to find an audience, without pasting it on the youth. They are impressionable, and likely to savor and repeat what they hear of the forbidden, without the maturity to distinguish between the different vocabularies and mindsets that every society harbors for different times and places.

Smut may drive itself from the market, and confound Gresham. So Judge Tamm suggests. Judges cannot, however, premise that there is not really a market that will endure.[9] In any event, there is a problem of the transition period. Even the most earnest advocates of freedom accept the role of government in protecting those who lack capacity.

## IV

It is appropriate to acknowledge some inexactness in the agency's approach, and to say that this is an abiding discomfort but not a brand of invalidity. Vagueness is to some extent inherent in the subject matter, and is heightened by a procedure, of rulings in particular instances, that presents problems but also has virtues. The Supreme Court's long struggle with obscenity cases reflects the underlying complexities, and those cases involved criminal sanctions. Nor is regulation of indecency precluded by the administrative agency setting. *Miller*

has language that features the value of a finding by a jury representing the community. Yet *Miller's* continuation of an obscenity exception to freedom of press has been approved in other cases where there was no criminal prosecution and no jury.[10] I see no constitutional impediment either to an agency's determination in the first instance, or to its use of an approach much like that used by the courts, disposing of particular cases presented with an indication of underlying principles—so long as there is judicial review.

In the case of the Federal Communications Commission, there can be judicial review of any obscenity-indecency ruling at the instance of those who want to see and hear the material even if the licensee is ready to drop the matter. *Illinois Citizens Committee for Broadcasting v. FCC*, 169 U.S.App.D.C. 166, 515 F.2d 397 (1974). Judicial review would ensure the protection afforded by the Constitution to works professing literary, artistic, political or scientific values.[11] The court would further guarantee that any determination of obscenity or indecency reflects the "hard look" by the agency appropriate where broadcast freedom and choice is limited.[12] Finally the court would require that the agency fully respect the licensee's range of discretion, and not disapprove the licensee's action merely because the agency had a different view of the matter, but only because the

9. The British Broadcasting Corporation experience cited by Judge Tamm (at p. 18) may not be transportable. The British began with commercial domination of the airwaves, and recoiled from its excess to develop BBC as a government agency, with a tradition of independence from the executive, that would operate in the public interest without the need for operating profits. The United States began with government operation of airwaves, which Herbert Hoover resolved should never be captured by commercial interests. But it later determined to permit radio (and later TV) broadcasting to draw on the energy of private enterprise—and that prime mover demands the spark of private profit. Whatever pornography's claim to constitutional protection, its basic reason for existence is to make money in the market. And if some publishers or broadcasters are engaged in disseminating the interdicted as a matter of principle, then the disapproval of the majority will not be a barrier, and might even be a spur.

10. *United States v. Twelve 200 Ft. Reels of Super 8 mm. Film*, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); *Alexander v. Virginia*, 413 U.S. 836, 93 S.Ct. 2803, 37 L.Ed.2d 993 (1973); *Star v. Preller*, 419 U.S. 956, 95 S.Ct. 217, 42 L.Ed.2d 173, *aff'ng mem* 375 F.Supp. 1093 (D.Md.1974) (3-judge court).

11. I would explicitly add "educational" values, see H. Leventhal, *The 1973 Round of Obscenity-Pornography Decisions*, 59 ABAJ 1261, 1264 (1973).

12. *WAIT Radio v. FCC*, 148 U.S.App.D.C. 179, 459 F.2d 1203, *cert. denied*, 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972); *Greater Boston TV Corp. v. FCC*, 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

licensee had gone so far as to be marked for an abuse of his license.[13]

## V

What we have before us is the Federal Communications Commission order declaring the invalidity of particular language "as broadcast." That carries with it the limitations of time and deliberate repetition identified by the FCC.

The limitation of time is the *afternoon*. I am aware that the FCC's only indication of acceptability for the broadcast referred to the late hours of the evening.[14] But the issue of what might be broadcastable in the early evening is not before us, and raises different considerations. That would be a time when there were large numbers of children in home audiences generally, but the issue could be raised that for homes where parents really care about such matters there would be at least one parent in a position to monitor the material heard and seen. A ruling expanding the zone of the broadcastable to adult levels might apply when the time of broadcast is such that the great preponderance of children are subject to parental control.

Under *Miller* matter is not "obscene" if it has literary, educational, artistic, political or scientific value, and accordingly is not "indecent" (under a Miller-analogue test) if it has such value. But the fact that it has such value for adults does not mean it has such value in a broadcast geared to children—or in a broadcast where a substantial number of children are likely to be in the audience without parental supervision.[15] A different question arises as to whether it may have such value for a broadcast during evening hours when children are likely to be in the audience, but are also likely to be under parental control, in the case of those parents who really are concerned with and want to avoid the exposure of their children. Such a program may have serious literary, artistic, political or scientific value for its audience—assuming the exclusion from the audience (due to opportunity for parental control) of most of the children who by disposition, training or understanding, will be dominated by the blunt impact of the sexual and excretory words, and for whom the serious content will be non-existent.

There are certain aspects in which the FCC's order may be subject to particular question—both as to words interdicted [16]

---

**13.** *Straus Communications, Inc. v. FCC*, 174 U.S.App.D.C. 149, 530 F.2d 1001 (1976); *National Broadcasting Co. v. FCC*, 170 U.S.App. D.C. 173, 516 F.2d 1101 (1975), *cert. denied*, 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1975). Compare *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring: "I know it when I see it . . . .").

**14.** In addition to the reference in ¶ 16, quoted in the first footnote of this dissent, there is also paragraph 12, preceding the conclusion, as follows:

12. When the number of children in the audience is reduced to a minimum, for example during the late evening hours, a different standard might conceivably be used. The definition of indecent would remain the same, i. e., language that describes in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs. However, we would also consider whether the material has serious literary, artistic, political or scientific value, as the licensee claims. *Miller v. California, supra.*

**15.** In *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) the Court upheld a state law providing distribution to minors under 17 of material not obscene for adults. Justice Brennan's majority opinion holds the legislation could properly support parents in their discharge of their primary responsibility for children's well-being, including the assessment of sex-related material "according 'to prevailing standards in the adult community as a whole with respect to what is suitable material for minors.'" *See* 390 U.S. at 639, 88 S.Ct. at 1280.

**16.** If the case had been presented from the start in a different way, I would have remanded for further consideration, to make the rulings and standards more specific in order to provide more information for other licensees, which is the FCC's purpose. For one thing, I am not clear why the word "tit" is in the FCC's Index, because it is neither a sexual nor excretory organ. The fact that Mr. Carlin included it in his list of the verboten does not mean that the FCC must adopt his position. But I do not think there is any material legal objection to

and as to the duration of the time span.[17] Those are not the objections to the order that were preserved for this court. I would reserve those for another time—as calling for a modification of the FCC order, on objections duly presented, but not an all-out condemnation.

## VI

As a judge of what the Constitution calls an "inferior" court, my duty is to apply *Miller* unless and until the Supreme Court modifies it. Given the independence of a legal commentator (see note 11), I have voiced my gravest doubts concerning the vitality of *Miller's* effort to resolve the "intractable" question of obscenity. But even my personal approach would let freedom ring with some muffle of time and place as a constitutional trade-off—to assist parents in their protection of young children during the uniquely prolonged period of development needed to permit the emergence of a competent and consenting person, and to protect some privacy in the home and in residential and civic neighborhoods that are family areas of shared community space. The latter consideration is not priggishness, but reflects a value that Alexander Bickel identified (see note 5, *supra*) as society's concern with the quality of its community life. As for children, even assuming that children's exposure to pornography is as inevitable as pornography itself, there is protection in disapproval, in the child's knowledge that the pornography that is seen and heard is not approved by parents or society.[18] That much of a trade-off is likely to persist under *Miller*, even if that decision is modified. It leads me to affirm the FCC's effort to apply *Miller* in the context of daytime broadcasting—when the protection of children is a compelling state interest.[19] I respectfully dissent.

## APPENDIX 1

## APPENDIX

The following is a verbatim transcript of "Filthy Words" (Cut 5, Side 2), from the record album "George Carlin, Occupation: Foole" (Little David Records, LD 1005).

"Aruba-du, ruba-tu, ruba-tu.

I was thinking about the curse words and the swear words, the cuss words and the words that you can't say, that you're not supposed to say all the time, cause words or people into words want to hear your words. Some guys like to record your words and sell them back to you if they can, (laughter) listen in on the telephone, write down what

the ruling sustaining the complaint against petitioner, on the basis of its broadcast.

**17.** Chief Judge Bazelon offers the thought that children are not home at 2 p. m. (page —— n. 2 of 181 U.S.App.D.C., page 19 of 556 F.2d n. 2). That is *not* the objection put before the FCC or argued on appeal. That objection would merit proof and agency reflection—on such matters as exposure of pre-school age children, whether schools in the area served by the station let some children out before 2 p. m., etc. In this record, issue was not joined with the FCC's finding that 2 p. m. was a time when children were "undoubtedly in the audience." (Par. 14, quoted in note 1 of this dissent).

**18.** Compare the position of Professor Willard Gaylin, professor of psychiatry and law at Columbia University, presented in *The Prickly Problems of Pornography, Book Review of Kuh, Foolish Fig Leaves?* 77 Yale L.J. 579, 594 (1968):

The child is protected in his reading of pornography by the knowledge that it is pornographic, that is, disapproved. It is outside of parental standards and not a part of his identification processes. To openly permit implies parental approval and even suggests seductive encouragement.

If this is so of parental approval, it is equally so of societal approval—another potent influence on the developing ego. The law is an instrument in the establishment of social behavior—and in the judging of it.

The foregoing was quoted in Justice Brennan's majority opinion in *Ginsberg v. New York*, 390 U.S. 629 at 642, 88 S.Ct. 1274. When restating it recently, Professor Gaylin added: "The law, more than most lawyers seem to realize, is an ethical determinant and a moral force." W. Gaylin, *Obscenity*, Washington Post, Feb. 20, 1977, p. C-1.

**19.** *Illinois Citizens Committee for Broadcasting v. FCC*, 169 U.S.App.D.C. 166, 174, 515 F.2d 397, 405 (1975); *See Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

words you say. A guy who used to be in Washington knew that his phone was tapped, used to answer, Fuck Hoover, yes, go ahead. (laughter) Okay. I was thinking one night about the words you couldn't say on the public, ah, airwaves, um, the ones you definitely couldn't say, ever, cause I heard a lady say bitch one night on television, and it was cool like she was talking about, you know, ah, well, the bitch is the first one to notice that in the litter Johnie right (murmur) Right. And, uh, bastard you can say, and hell and damn so I have to figure out which ones you couldn't and ever and it came down to seven but the list is open to amendment, and in fact, has been changed, uh, by now, ha, a lot of people pointed things out to me, and I noticed some myself. The original seven words were, shit, piss, fuck, cunt, cocksucker, motherfucker, and tits. Those are the ones that will curve your spine, grow hair on your hands and (laughter) maybe, even bring us, God help us, peace without honor (laughter) um, and a bourbon. (laughter) And now the first thing that we noticed was that the word fuck was really repeated in there because the word motherfucker is a compound word and it's another form of the word fuck. (laughter) You want to be a purist it doesn't really—it can't be on the list of basic words. Also, cocksucker is a compound word and neither half of that is really dirty. The word—the half sucker that's merely suggestive (laughter) and the word cock is a half-way dirty word, 50% dirty—dirty half the time, depending on what you mean by it. (laughter) Uh, remember when you first heard it, like in 6th grade, you used to giggle. And the cock crowed three times, heh (laughter) the cock—three times. It's in the Bible, cock is in the Bible. (laughter) And the first time you heard about a cock-fight remember— What? Huh? Naw. It ain't that, are you stupid? man, (laughter, clapping) It's chickens, you know, (laughter) Then you have the four letter words from the old Anglo-Saxon fame. Uh, shit and fuck. The word shit, uh, is an interesting kind of word in that the middle class has never really accepted it and approved it. They use it like, crazy but it's not really okay. It's still a rude, dirty, old kind of gushy word. (laughter) They don't like that, but they say it, like, they say it like, a lady now in a middleclass home, you'll hear most of the time she says it as an expletive, you know, it's out of her mouth before she knows. She says, Oh shit oh shit, (laughter) oh shit. If she drops something, Oh, the shit hurt the broccoli. Shit. Thank you. (footsteps fading away) (papers ruffling)

Read it! (from audience)

Shit! (laughter) I won the Grammy, man, for the comedy album. Isn't that groovy? (clapping, whistling) (murmur) That's true. Thank you. Thank you man. Yeah. (murmur) (continuous clapping) Thank you man. Thank you. Thank you very much, man. Thank, no, (end of continuous clapping) for that and for the Grammy, man, cause (laughter) that's based on people liking it man, yeh, that's ah, that's okay man. (laughter) Let's let that go, man. I got my Grammy, I can let my hair hang down now, shit. (laughter) Ha! So! Now the word shit is okay for the man. At work you can say it like crazy. Mostly figuratively, Get that shit out of here, will ya? I don't want to see that shit anymore. I can't *cut* that shit, buddy. I've had that shit up to here. I think you're full of shit myself. (laughter) He don't know shit from Shinola (laughter) you know that? (laughter) Always wondered how the Shinola people felt about that. (laughter) Hi, I'm the new man from Shinola. (laughter) Hi, how are ya? Nice to see ya. (laughter) How are ya? Boy, I don't know whether to shit or wind my watch. (laughter) Guess, I'll shit on my watch. (laughter) Oh, *the* shit is going to hit *de* fan. (laughter) Built like a brick shit-house. (laughter) Up, he's up shit's creek. (laughter) He's had it. (laughter) He hit me, I'm sorry. (laughter) Hot shit, holy shit, tough shit, eat shit, (laughter) shit-eating grin. Uh, whoever thought of that was ill. (murmer laughter). He had a shit-eating grin! He had a what? (laughter) Shit on a stick. (laughter) Shit in a handbag. I always liked that. He ain't worth shit in a hand-

bag. (laughter) Shitty. He acted real shitty. (laughter) You know what I mean? (laughter) I got the money back, but a real shitty attitude. Heh, he had a shit-fit. (laughter) Wow! Shit-fit. Whew! Glad I wasn't there. (murmur, laughter) All the animals—Bull shit, horse shit, cow shit, rat shit, bat shit. (laughter) First time I heard bat shit, I really came apart. A guy in a Oklahoma, Boggs, said it, man. Aw! Bat shit. (laughter) Vera reminded me of that last night, ah (murmur). Snake shit, slicker than owl shit. (laughter) Get your shit together. Shit or get off the pot. (laughter) I got a shit-load full of them. (laughter) I got a shit-pot full, all right. Shit-head, shit-heel, shit in your heart, shit for brains, (laughter) shit-face, heh. (laughter) I always try to think how that could have originated; the first guy that said that. Somebody got drunk and fell in some shit, you know. (laughter) Hey, I'm shit-face. (laughter) Shit-face, *today*. (laughter) Anyway, enough of that shit. (laughter) The big one, the word fuck that's the one that hangs them up the most. Cause in a lot of cases that's the very act that hangs them up the most. So, it's natural that the word would, uh, have the same effect. It's a great word, fuck, nice word, easy .word, cute word, kind of. Easy word to say. One syllable, short u. (laughter) Fuck. (Murmur) You know, it's easy. Starts with a nice soft sound fuh ends with a *kuh*. Right? (laughter) A little something for everyone. Fuc*k*. (laughter) Good word. Kind of a proud word, too. Who are you? I am *FUCK*. (laughter) *FUCK OF THE MOUNTAIN*. (laughter) Tune in again next week to *FUCK OF THE MOUNTAIN*. (laughter) It's an interesting word too, cause it's got a double kind of a life—personality—dual, you know, whatever the right phrase is. It leads a double life, the word fuck. First of all, it means, sometimes, most of the time, fuck. What does it mean? It means to make love. Right? We're going to make love, yeh, we're going to fuck, yeh, we're going to fuck, yeh, we're going to make love, (laughter) we're really going to fuck, yeh, we're going to make love. Right?

And it also means the beginning of life, it's the act that begins life, so there's the word hanging around with words like love, and life, and yet on the other hand, it's also a word that we really use to hurt each other with, man. It's a heavy. It's one that you save toward the end of the argument. (laughter) Right? (laughter) You finally can't make out. Oh, fuck you man. I said, fuck you. (laughter, murmur) Stupid fuck. (laughter) Fuck you and everybody that looks like you, (laughter) man. It would be nice to change the movies that we already have and substitute the word fuck for the word kill, wherever we could, and some of those movies cliches would change a little bit. Madfuckers still on the loose. Stop me before I fuck again. Fuck the ump, fuck the ump, fuck the ump, fuck the ump, fuck the ump. Easy on the clutch Bill, you'll fuck that engine again. (laughter) The other shit one was, I don't give a shit. Like it's worth something, you know? (laughter) I don't give a shit. Hey, well, I don't take no shit, (laughter) you know what I mean? You know why I don't take no shit? (laughter) Cause I don't give a shit. (laughter) If I give a shit, I would have to pack shit. (laughter) But I don't pack no shit cause I don't give a shit. (laughter) You wouldn't shit me, would you? (laughter) That's a joke when you're a kid with a worm looking out the bird's ass. You wouldn't shit me, would you? (laughter) It's an eight-year-old joke but a good one. (laughter) The additions to the list, I found three more words that had to be put on the list of words you could never say on television, and they were fart, turd and twat, those three. (laughter) Fart, we talked about, it's harmless. It's like tits, it's a cutie word, no problem. Turd, you can't say but who wants to, you know? (laughter) The subject never comes up on the panel so I'm not worried about that one. Now the word twat is an interesting word. Twat! Yeh, right in the twat. (laughter) Twat is an interesting word because it's the only one I know of, the only slang word applying to the, a part of the sexual anatomy that doesn't have another meaning to it. Like, ah, snatch, box and pussy all have

**40**

other meanings, man. Even in a Walt Disney movie, you can say, We're going to snatch that pussy and put him in a box and bring him on the airplane. (murmur, laughter) Everybody loves it. The twat stands alone, man, as it should. And two-way words. As, ass is okay providing you're riding into town on a religious feast day. (laughter) You can't say, up your *ass*. (laughter) You can say, stuff it! (murmur) There are certain things you can say its weird but you can just come so close. Before I cut, I, uh, want to, ah, thank you for listening to my words, man, fellow, uh, space travelers. Thank you man for tonight, and thank you also. (clapping, whistling)"

